**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-1783 & 22-2055
_____

THOMAS J. KAIRYS

v.

SOUTHERN PINES TRUCKING, INC.,
                                    Appellant
_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 2-19-cv-01031)
District Judge: Honorable J. Nicholas Ranjan
_____

Argued on April 20, 2023

Before: HARDIMAN, PORTER, and FISHER, *Circuit
Judges*.

(Filed: July 25, 2023)


Audrey J. Copeland [Argued]
Marshall Dennehey Warner Coleman & Goggin

620 Freedom Business Center, Suite 405
King of Prussia, PA 19406

Teresa O. Sirianni
Marshall Dennehey Warner Coleman & Goggin
Union Trust Building, Suite 700
501 Grant Street
Pittsburgh, PA 15219

   *Counsel for the Appellant*

Christine T. Elzer [Argued]
Tamra Van Hausen
Elzer Law Firm, LLC
100 First Avenue, Suite 1010
Pittsburgh, PA 15222

   *Counsel for the Appellee*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Southern Pines Trucking, Inc. (Southern Pines or the Company) appeals the District Court's judgment for Thomas Kairys on his retaliation claim under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*. Southern Pines also challenges the Court's award of $111,981.79 in attorneys' fees and costs. For the reasons that follow, we will affirm.

I

A

In March 2016, the owner and Chief Executive Officer of Southern Pines, Pat Gallagher, recruited Kairys to serve as Vice President of Sales to help the Company grow its cryogenic trucking services. Southern Pines had just two other employees when Kairys joined the Company: Bob Gallagher (Pat's brother and the Vice President of Operations) and a truck fleet manager. Soon after he started working for Southern Pines, Kairys was diagnosed with degenerative arthritis and required hip replacement surgery. Kairys notified his supervisor, Chad Vittone—the Chief Financial Officer of PGT Trucking, an affiliated business also owned by Pat Gallagher—that he would use a week of vacation time. Vittone said that was "no problem," so Kairys had the surgery on November 30, 2017. Kairys missed seven days of work.

The Southern Pines employee health insurance plan with the University of Pittsburgh Medical Center (UPMC) covered Kairys's surgery. Because the Company was self-insured, it paid a portion of each claim made under the UPMC policy. Kairys's surgery caused the Company's health insurance costs to rise markedly. The claims invoice paid for the week of December 10–16, 2017, shortly after Kairys's hip replacement, totaled $23,277.07, with $13,394.94 billed to employee payroll code "SP01." That invoice was the highest weekly amount in a six-month period by nearly $8,000. And the SP01 row was highlighted on every healthcare invoice that Southern Pines produced in discovery.

According to Kairys's trial testimony, after he returned to work in December 2017, Bob Gallagher told him to "lay

3

low" because Pat was upset about Kairys's surgery. App. 320. Four months later, on April 23, 2018, Pat fired Kairys. Pat claimed that Kairys's position was eliminated because Southern Pines had "maxed out" its sales potential in cryogenic trucking and was unwilling to buy more equipment, particularly because qualified drivers were hard to find. App. 475–76. Less than two months after Kairys's termination, the Company hired Kyle Kunkle, an employee of PGT, to work part-time for Southern Pines in a hybrid role. Kunkle mainly helped the Company with operations, but he also did some sales maintenance, like helping entertain Southern Pines customers. Maintaining customer relationships had been part of Kairys's role before he was terminated.

B

Kairys sued Southern Pines, alleging that his termination was discriminatory and retaliatory contrary to various state and federal statutes. His six claims included: discrimination and retaliation under the Americans with Disabilities Act (Count I); discrimination under the Age Discrimination in Employment Act (Count II); retaliation under ERISA (Count III); breach of contract (Count IV); violation of the Pennsylvania Wage Payment and Collection Law (WPCL) (Count V); and discrimination and retaliation under the Pennsylvania Human Relations Act (PHRA) (Count VI).

After discovery, the Company moved for summary judgment on all counts. Kairys cross-moved for partial summary judgment only as to his breach of contract and WPCL claims (Counts IV and V). The District Court denied the Company's motion and granted in part Kairys's cross-motion. It determined that a reasonable factfinder could conclude that

4

the Company retaliated or discriminated against Kairys in violation of the ADA, ADEA, ERISA, and PHRA. It also determined that Southern Pines breached its contract with Kairys, but it reserved the damages determination for the jury. The Court denied summary judgment to Kairys on the WPCL claim.

The case proceeded to trial, and the jury found for Southern Pines on Kairys's claims under the ADA, ADEA, and PHRA. The jury also returned an advisory verdict for the Company on the ERISA claim, finding that Kairys did not prove by a preponderance of the evidence that Southern Pines retaliated against him for exercising his right to ERISA-protected benefits or interfered with his right to future benefits. That verdict was only advisory because Kairys had no right to a jury trial on his ERISA claim for equitable relief. *See Pane v. RCA Corp.*, 868 F.2d 631, 636 (3d Cir. 1989). Kairys prevailed on his WPCL claim and the jury awarded him $5,384.62 in separation pay, which included damages on Kairys's breach of contract claim.

The parties then briefed the ERISA claim to the District Court. Southern Pines asked the District Court to adopt the advisory verdict because Kairys failed to prove his case on that claim. The District Court disagreed. The Court observed that "the jury made no specific findings of fact," and explained that it would independently consider the trial evidence to evaluate the ERISA claim. *Kairys v. S. Pines Trucking, Inc.*, 595 F. Supp. 3d 376, 380 (W.D. Pa. 2022). The Court then found that Kairys had proved by a preponderance of the evidence that the Company retaliated against him for using ERISA-protected benefits and interfered with his right to future benefits. The Court awarded Kairys $67,500 in front pay and determined that he was entitled to reasonable attorneys' fees and costs.

5

Kairys petitioned for those fees and costs under 29 U.S.C. § 1132(g), and the District Court awarded $111,981.79. Southern Pines timely appealed the judgment on the ERISA claim and the order awarding fees and costs, and we consolidated the appeals.

II

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's factual findings, including its finding of intentional discrimination, for clear error. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985); Fed. R. Civ. P. 52(a)(6) (in action tried with advisory jury, "[f]indings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility"). We review the sufficiency of the evidence de novo. *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 157 (3d Cir. 2001). And we review the District Court's attorneys' fees determination for abuse of discretion. *Rode v. Dellarciprete*, 892 F.2d 1177, 1182 (3d Cir. 1990).

III

We first consider the Company's argument that the District Court's ERISA judgment conflicted with the jury's factual findings on evidence common to all claims.

A

Kairys argues that Southern Pines forfeited this argument. We disagree. Kairys is correct that the Company never argued to the District Court that it was bound to accept

6

the jury's factual findings common to the equitable and legal claims. But parties cannot forfeit the application of "controlling law." *United States v. Reading Co.*, 289 F.2d 7, 9 (3d Cir. 1961); *see also Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) ("It is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard."). So the District Court had to adhere to the principle that "[w]hen litigation involves both legal and equitable claims . . . the right to a jury trial on the legal claim, including all issues common to both claims, must be preserved by . . . accepting the jury's findings on common facts for all purposes." *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 228 (3d Cir. 2009).

B

The District Court wrote that it was "not bound by the advisory verdict," citing *Hayes v. Community General Osteopathic Hospital* for the proposition that "[a] trial court has full discretion to accept or reject the findings of an advisory jury." *Kairys*, 595 F. Supp. 3d at 380 (quoting 940 F.2d 54, 57 (3d Cir. 1991)). But *Hayes* involved an advisory jury only, so we had no occasion to consider the relationship between binding and advisory jury verdicts issued in the same suit. 940 F.2d at 56. Here, *AstenJohnson*'s more specific command applied—Kairys's suit involved both a binding jury verdict on legal claims and an advisory jury verdict on the equitable claim. So the District Court had to "accept[] the jury's findings on common facts" when deciding the equitable ERISA claim. *AstenJohnson*, 562 F.3d at 228. Otherwise, "the seventh amendment right to a jury trial would be significantly attenuated." *Roebuck v. Drexel Univ.*, 852 F.2d 715, 737 (3d Cir. 1988).

The District Court faced a quandary because the jury made no specific findings of fact. Neither Southern Pines nor Kairys proffered a special verdict form, and the general verdict form asked only whether Kairys had proved "by a preponderance of the evidence" that the Company discriminated or retaliated against him because of a particular protected characteristic or activity. The jury could check "Yes" or "No" in response for each claim. But that the "basis of the jury's verdict [wa]s unclear" did not absolve the District Court of its duty to ensure that its disposition of the equitable claim was consistent with any common factual findings underlying the jury's verdict on the legal claims. *Miles v. Indiana*, 387 F.3d 591, 600 (7th Cir. 2004).

We therefore hold that, in a suit with equitable and legal claims and facts common to both, a district court must determine whether the jury verdict on the legal claims "necessarily implie[s]" the resolution of any common factual issues, even when the jury fails to make explicit findings of fact. *Ag Servs. of Am., Inc. v. Nielsen*, 231 F.3d 726, 731 (10th Cir. 2000). The court then "must follow the jury's implicit or explicit factual determinations in deciding the equitable claims." *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (cleaned up). The converse is also true. "[A]ny findings not necessarily implied by, but nonetheless consistent with, the verdict" are for the court to decide. *Covidien LP v. Esch*, 993 F.3d 45, 56 (1st Cir. 2021); *see also* Fed. R. Civ. P. 52(a) ("In an action tried . . . with an advisory jury, the court must find the facts specially and state its conclusions of law separately."). So the trial court retains full discretion to diverge from an advisory jury verdict (or to reach a result without the help of an advisory jury), so long as the factual findings underlying its contrary conclusion are consistent with those explicitly or

8

implicitly found by the jury on the claims for which the jury sat as factfinder.

C

Though the District Court should have analyzed in the first instance whether the jury's verdict on the ADA, ADEA, and PHRA claims necessarily implied the resolution of any factual issues common to the ERISA claim, we do so here. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 276 n.9 (3d Cir. 2019) ("[W]e may affirm on any ground supported by the record.").

Southern Pines argues that "[t]here is no set of facts where [the Company] could prevail on the disability and age discrimination claim, but not prevail on the ERISA claim." Southern Pines Br. 41. We disagree. The ADA, ADEA, PHRA, and ERISA claims have distinct elements of proof. Each required the jury to find that a different protected characteristic or activity was a determinative factor in Kairys's termination. So a jury could possibly find that Kairys's use of his health benefits motivated the Company's decision, not his age, disability (arthritis), or request for time off work.

Consider first the ADA retaliation claim. Kairys had to prove a causal connection between his termination and his request for a reasonable accommodation (*i.e.*, leave for hip surgery). By contrast, the ERISA retaliation claim required Kairys to prove "that there was a causal connection between his termination and his use of the employee benefit plan." Dist. Ct. Dkt. 119, at 18. A jury could conclude that, although Kairys was not fired in retaliation for requesting time off, he *was* fired in retaliation for using his healthcare benefits.

Next, consider the ADA, ADEA, and PHRA discrimination claims. The ADA and PHRA discrimination claims required Kairys to prove that "his *disability* was a determinative factor in [the Company's] decision to terminate [him]." *Id.* at 8 (emphasis added). Similarly, the ADEA and PHRA discrimination claims required Kairys to prove "that his *age* was a determinative factor in [the Company's] decision to terminate his employment." *Id.* at 20 (emphasis added). By contrast, the ERISA claim required Kairys to prove that "*utilizing the employee benefit plan* was a determinative factor in [the Company's] decision to terminate his employment." *Id.* at 18 (emphasis added). That neither Kairys's arthritis nor his age was a determinative factor in his termination does not necessarily mean that his use of benefits *also* must not have been a determinative factor.

Southern Pines contends that the jury instructions on the ADA claim tell a different story. Those jury instructions directed: "If you believe [the Company's] stated reason(s) and if you find that the termination would have occurred regardless of his disability *and/or the cost of the medical expenses associated with his disability*, then you must find for [the Company] on Mr. Kairys's ADA claim." App. 634 (emphasis added). The Company suggests that this instruction renders the District Court's ERISA decision inconsistent with the jury's ADA verdict.[1]

Though we think it a close question, the jury instructions' use of "or" convinces us that the jury's ADA verdict does not necessarily imply that Southern Pines did not

---

[1] We express no opinion on the viability of an ADA discrimination theory based on the cost of medical expenses associated with the disability.

10

discriminate against Kairys based on the cost of his medical expenses. The jury was instructed that it must find for Southern Pines if the Company would have fired Kairys (1) regardless of his disability *or* (2) regardless of the cost of his medical expenses. Based on that disjunctive choice, the jury could have ruled for Southern Pines because it concluded the Company would have fired Kairys regardless of his disability, *even if* the Company would *not* have fired Kairys regardless of the cost of his medical expenses. Indeed, a few lines later, the Court emphasized: "[e]ven if you find [the Company] had other reasons for terminating Mr. Kairys, you should find in his favor if you find that but for his *disability*, [the Company] would not have ended his employment." App. 635 (emphasis added). Our supposition is buttressed by the verdict form, which asked the jury if Kairys had proven that Southern Pines "discriminated against him *because of his disability*," with no reference to discrimination based on medical expenses. App. 710. Without more, we cannot say that the District Court's ERISA judgment was inconsistent with the jury's ADA verdict. *See Miles*, 387 F.3d at 600 ("[W]hen the basis of the jury's verdict is unclear, each of the potential theories supporting the verdict is open to contention unless this uncertainty [is] removed by extrinsic evidence showing the precise point involved and determined.") (cleaned up).

For these reasons, the District Court's judgment and findings for Kairys on the ERISA claim were not inconsistent with the jury's verdict on the ADA, ADEA, and PHRA claims.

IV

We turn next to the Company's argument that the evidence was insufficient to support the District Court's verdict for Kairys on his ERISA claim. Kairys again says that

11

the Company forfeited this argument.[2] Not so. The Company raised the same arguments before the District Court about the sufficiency of the evidence it raises now on appeal. So we turn to the merits of the Company's sufficiency-of-the-evidence argument.

Kairys's ERISA claim arose under Section 510, which states:

> It shall be unlawful for any person to discharge . . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

---

[2] Kairys also characterizes the Company's sufficiency-of-the-evidence argument as seeking judgment as a matter of law on the ERISA claim and contends that the Company waived this argument by failing to renew its motion for judgment as a matter of law. But judgment as a matter of law under Rule 50(a) of the Federal Rule of Civil Procedure may be granted only on claims tried by a jury, so the Company's failure to renew its motion is inapplicable to the equitable ERISA claim before the Court. *See Spartan Concrete Prods., LLC v. Argos USVI, Corp.*, 929 F.3d 107, 111 n.1 (3d Cir. 2019); Fed. R. Civ. P. 52(a)(5) (in an action tried by an advisory jury, "[a] party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings").

29 U.S.C. § 1140. By its plain terms, Section 510 prohibits not only retaliation for use of past benefits, but also interference with the right to future benefits. *Kowalski v. L & F Prods.*, 82 F.3d 1283, 1288 (3d Cir. 1996). The District Court found that Kairys prevailed on both theories.

Kairys had to prove that Southern Pines intended to violate Section 510. *DiFederico v. Rolm Co.*, 201 F.3d 200, 204–05 (3d Cir. 2000). Because he offered no direct evidence of discriminatory intent, the *McDonnell Douglas* burden-shifting framework applied. *Id.* The Company's appeal focuses on the third step of that framework, where Kairys had to show that the Company's proffered legitimate, nondiscriminatory reason for his termination was pretextual by persuading the Court either "that the discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 785–86 (3d Cir. 2007), *as amended* (May 31, 2007) (cleaned up).

A

Southern Pines first attacks the District Court's credibility determinations. The Company argues that the District Court should not have credited Kairys's testimony that Bob Gallagher told him to "lay low" following his surgery, because Bob and Pat testified to the contrary. This argument is a nonstarter because such credibility determinations are for the trier of fact, not the appellate court. We give "great[ ] deference" to the District Court's factual findings that rest on credibility because that Court is in a "superior[ ] . . . position to make" such determinations. *Anderson*, 470 U.S. at 574–75;

13

*see also* Fed. R. Civ. P. 52(a)(6) (stating that a "reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility"). Here, after hearing Kairys and the Gallaghers testify at trial and "comparing their statements with other evidence submitted," the Court found Kairys "more credible on this point." *Kairys*, 595 F. Supp. 3d at 385. And it disbelieved Pat Gallagher's explanation for why he became upset after Kairys's hip surgery—that he didn't know Kairys would miss work—for good reason. Kairys reported to Vittone, not Pat Gallagher, and Pat was not involved in the day-to-day management of Southern Pines. The District Court's credibility determinations and related factual findings were not clearly erroneous.

B

Southern Pines also challenges the Court's factual findings supporting pretext. The Company insists there is "no evidence that the elimination of Kairys's position and his termination was anything other than a legitimate, nondiscriminatory business decision." Southern Pines Br. 17. The record does not support that broad statement. The District Court identified several "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Company's proffered legitimate reason. *Kowalski*, 82 F.3d at 1289 (citation omitted).

The District Court found implausible the Company's explanation for terminating Kairys: that his position was unnecessary once the Southern Pines cryogenic truck fleet reached full utilization. The Court explained that the Company's bonus plan showed that utilization of trucking leases varied, so "it [was] not plausible that reaching full utilization any given month would lead Pat Gallagher to

14

decide—that same month—that there would be no more work for Mr. Kairys to do." *Kairys*, 595 F. Supp. 3d at 384. And Kairys's offer letter specifically incentivized full utilization with a $3,000 bonus. The letter also did not warn Kairys that full utilization may cost him his job; instead, it explained that bonuses are calculated monthly, recognizing that utilization could fluctuate. The Court further found that Pat's testimony about another reason for Kairys's termination—an alleged shortage of certified drivers—was "evasive" and "lacking in credibility." *Id.* Pat never mentioned that reason in his deposition testimony.

The Court also determined that the circumstances surrounding Pat Gallagher's termination of Kairys were unusual. Pat considered no documents and consulted no one before firing Kairys, though he had unilaterally terminated employees only when the employee performed poorly or misbehaved. And Pat acknowledged that Kairys was a high-performing employee who earned an $11,458 bonus less than a week before he was fired.

Finally, the Court found that the Company's decision to borrow Kunkle from a sister company after firing Kairys undermined its claim that Kairys was no longer needed. Some of Kunkle's duties overlapped with Kairys's; though Kairys focused on sales and Kunkle focused on operations, the Court credited Kairys's testimony that his role involved both operations and sales work.

We discern no clear error in these findings. Taken together, the Court's "interpretation of the facts" to find pretext "has support in inferences that may be drawn from the facts in the record." *Anderson*, 470 U.S. at 577.

15

C

Last, Southern Pines argues that the District Court clearly erred by finding that Kairys's past and anticipated future use of his ERISA benefits motivated the Company's termination decision. We disagree because the record shows the District Court thoroughly considered the evidence and drew reasonable inferences to conclude that Southern Pines terminated Kairys because of the cost of his past and anticipated future hip replacement surgeries.

The District Court reasonably inferred that the Company knew about the cost of Kairys's surgery. It first determined that the many highlights on the Company's healthcare invoices corresponded to Kairys's hip replacement surgery costs based on these facts: (1) employees on the invoices were listed using codes beginning with "P," "S," and "SP"; (2) Pat Gallagher had three companies starting with those letters: PGT, Sudbury Express, and Southern Pines; (3) only 20 employees from those three companies used the same UPMC plan as Kairys; (4) Southern Pines had only three employees; and (5) December 10–16, 2017, shortly after Kairys's surgery, showed a spike in expenses because of a claim paid for "SP01." From these facts, the Court concluded: "it would not have been difficult [for someone at the Company] to identify 'SP01' as Mr. Kairys and parse his expenses." *Kairys*, 595 F. Supp. 3d at 387. And the Company offered no contrary explanation for why SP01 was the only employee code highlighted on the invoices.

The Court also found that the proximity between the end of the healthcare benefits year and Kairys's termination was probative of the Company's discriminatory intent. Though Pat Gallagher testified he had never seen the invoices on which

16

Kairys's expenses were highlighted, he admitted that he "may have looked at" healthcare invoices "in the course of reviewing the financials," App. 472, and that he had a general awareness of the company's insurance costs because he reviewed them annually. The Court inferred that Pat "would have reviewed medical costs near the end of the benefit year"—that is, shortly before May 1, 2018. *Kairys*, 595 F. Supp. 3d at 387. So the Court concluded that Pat learned the true cost of Kairys's insurance expenses shortly before Kairys was fired on April 23 of that year. That finding is not clearly erroneous, nor is it inconsistent with Kairys's testimony that Pat was upset upon learning of Kairys's surgery in December. Pat may have delayed making a termination decision until he reviewed the health insurance records and considered the actual financial impact of Kairys's surgery.

Finally, the Court credited Kairys's testimony that he told Pat Gallagher he would need a second hip replacement, and it found that Pat was "evasive" when asked whether he knew that Kairys would need more surgery. *Id.*

For the reasons stated, none of the Court's factual findings supporting its holding that Kairys's past and anticipated future use of ERISA benefits was a determinative factor in the Company's termination decision leaves us "with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (citation omitted).

\*     \*     \*

In sum, the District Court's factual findings and credibility determinations were not clearly erroneous. And its

judgment on Kairys's equitable ERISA claim was supported by sufficient evidence.[3]

V

We turn finally to the Company's challenge to the District Court's award of reasonable attorneys' fees and costs. Southern Pines does not claim that Kairys is entitled to no fees. Instead, it contends the District Court did not sufficiently reduce fees to account for Kairys's losses before the jury on his age and disability claims.

ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). When the party entitled to fees "succeeded on only some of his claims," a district court should reduce fees to accurately reflect the "results obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). And where that party's claims "involve a common core of facts" or are "based on related legal theories," the court "should focus on the significance of the overall relief" obtained by that party "in relation to the hours reasonably expended on the litigation." *Id.* at 435.

Kairys proposed a 10 percent reduction in fees to account for his losses at trial; Southern Pines asked for at least 40 percent. The District Court acknowledged that "a substantial portion of the case" related to claims on which

---

[3] Southern Pines also argues in one paragraph, with no citation to authority, that the District Court erred by awarding Kairys $67,500 in front pay. That argument fails because it is derivative of the Company's unsuccessful contention that Kairys should not have prevailed on his ERISA claim.

18

Kairys did not prevail. *Kairys v. S. Pines Trucking, Inc.*, 2022 WL 1457786, at *1 (W.D. Pa. May 9, 2022). Yet it found that "much of the evidence presented did overlap between the successful and unsuccessful claims" because all claims had a "common core of facts" and were "'based on related legal theories' of discrimination and pretext." *Id.* (quoting *Hensley*, 461 U.S. at 435). Based on this overlap, the Court determined that a 25 percent reduction in pre-verdict fees was reasonable. *Id.* at *2. The Company offers no reason why a 25 percent reduction did not reflect Kairys's losses before the jury, and we find none. The District Court did not abuse its discretion.[4]

The Company's specific challenges to Kairys's counsel's time entries fare no better. The time entries were sufficiently detailed. *See Rode*, 892 F.2d at 1190 (stating that a fee petition must be "specific enough to allow the district court to determine if the hours claimed [were] unreasonable for the work performed") (cleaned up). And the entries were not so duplicative to warrant a reduction. *See id.* at 1187 ("A reduction for duplication is warranted only if the attorneys are unreasonably doing the same work.") (cleaned up). Fees were appropriately awarded for work related to Kunkle's testimony because that testimony influenced the ERISA claim. And Kairys properly excluded work related to the WPCL claim in

---

[4] Nor did the District Court abuse its discretion in declining to reduce fees related to Kairys's "successful ERISA claims, his successful motion to mold the verdict, and his counsel's fee petition." *Kairys*, 2022 WL 1457786, at *2. That work was "reasonably expended" on successful claims. *Hensley*, 461 U.S. at 435–36. And the Company's contention that the ERISA briefing was at Kairys's counsel's sole "insistence" is belied by the record. Southern Pines Br. 50.

19

his petition for fees. Last, we do not discern any abuse of discretion in the District Court's award of costs.

For these reasons, we will affirm the District Court's award of attorneys' fees and costs.

\* \* \*

The District Court's judgment for Kairys on the ERISA claim was neither inconsistent with the jury's verdict on his other claims, nor unsupported by the trial evidence. And the Court did not abuse its discretion in calculating reasonable attorneys' fees and costs. We will affirm.